INMAN, Judge.
*326 This appeal, following a jury verdict for property owners and entry of judgment notwithstanding *878 the verdict ("JNOV"), presents an issue of first impression: whether a municipality that takes an easement in privately owned oceanfront property to replenish the beach can avoid compensating the private property owner by asserting public trust rights vested in the State. On the record before us, we hold that the property owner is entitled to compensation as provided by the eminent domain statute.
We also hold that the jury's verdict was supported by a scintilla of evidence and reverse the trial court's entry of JNOV. But because expert testimony supporting the verdict was admitted in error, we remand for a new trial.
Defendants William W. Richardson and Martha W. Richardson (the "Richardsons") appeal the entry of JNOV that set aside a jury verdict of $60,000.00 compensating them for an easement taken by the Town of Nags Head (the "Town") through eminent domain. The Town took the easement across a portion of the Richardsons' property to complete a beach nourishment project. In entering the JNOV, the trial court concluded that the Richardsons were entitled to no compensation, reasoning that: (1) the land subject to the easement was encumbered by public trust rights, so the easement was already implied in favor of the Town to protect and preserve those public trust rights; and (2) in the event the easement was not already implied and thus constituted a compensable taking, the Richardsons failed to introduce evidence supporting the *327 jury's verdict based on the fair market value of the temporary easement. The Town cross-appeals the denial of its motions in limine seeking to exclude testimony by the Richardsons' expert witnesses. We reverse both entry of JNOV and denial of the motions in limine and remand for new trial.
I. FACTUAL AND PROCEDURAL HISTORY
In early 2011, the Town undertook a beach nourishment project along ten miles of its coastline to combat erosion and improve flood and hurricane protections. The Town mailed a notice of condemnation to owners of oceanfront property along the affected coastline, including the Richardsons. In the notice, the Town informed private property owners of the purposes of the project and asked them to grant the Town an easement across the sand beach portion of their properties. Specifically, the Town requested the following:
The property on which the Town will need to work lies waterward of the following locations, whichever is most waterward: the Vegetation Line; the toe of the Frontal Dune or Primary Dune; or the Erosion Escarpment of the Frontal Dune or Primary Dune.
...
Please be aware that this is not a perpetual easement; the Town only requests that it have the easement rights through April 1, 2021.
You will not lose land or access rights if you sign the easement. We are simply asking for your approval to deposit sand and work on a specific section of your property on one or perhaps more occasions, during a ten year period. Except for the brief periods when construction or repairs are ongoing, you will still be able to access the beach from your property and construct a dune walkover ....
At the outset of the nourishment project, a survey will be conducted to establish the existing mean high water line, which is currently your littoral property line and will remain your property line after the project. ... As set forth on the enclosed Notice, the Town may need to enter the beach in front of your property.
The notice also included this rendering, which identifies the portion of beach subject to the requested easement and the Town's understanding of related rights and interests:
*879 *328 ?
Finally, the notice stated that the Town would bring a condemnation action to take, by eminent domain, the easement rights requested in the notice if no voluntary grant of the easement was executed.
The Richardsons did not grant the Town the easement rights requested in the notice and, on 28 March 2011, the Town filed a condemnation action. The Town sought the following easement rights (the "Easement Rights") in the Richardsons' dry-sand beach property lying between the toe of the dune and the mean high water mark (the "Easement Area;" together with the Easement Rights as the "Easement"):
The Town, its agents, successors and assigns may use the Easement Area to evaluate, survey, inspect, construct, preserve, patrol, protect, operate, maintain, repair, rehabilitate, and replace a public beach, a dune system, and other erosion control and storm damage reduction measures together with appurtenances thereof, including the right to perform the following on the property taken:
• deposit sand together with the right of public use and access over such deposited sand;
• accomplish any alterations of contours on said land;
• construct berms and dunes;
• nourish and renourish periodically;
• perform any other work necessary and incident to the construction, periodic Renourishment and maintenance of the Town's Beach Nourishment Project ....
*329 Consistent with the Town's earlier notice, the Easement terminates on 1 April 2021.
The Richardsons filed an answer and motion to dismiss in response to the complaint. On 20 July 2011, the trial court entered a consent order denying the Richardsons' motion to dismiss, vesting title to the Easement in the Town as of the date the complaint was filed pursuant to Section 40A-42 of our General Statutes, and continuing all other hearings authorized by statute until after the Town deposited sand on the beach and Easement Area as part of the nourishment project. The action was then designated an exceptional case and assigned for all purposes to a single superior court judge.
In 2014, after the nourishment project was completed, Judge Gary Trawick presided over a hearing pursuant to Section 40A-47 on all issues other than damages. By order entered 17 December 2014 (the "40A-47 Order"), Judge Trawick decreed that: (1) the area affected by the taking of the Easement was the Richardsons' entire lot consisting of 30,395.2 square feet; (2) the property taken, i.e. , the Easement Area, was approximately 7,280.54 square feet of beach lying between the toe of the dune and the mean high water mark at the time of condemnation; and (3) the rights taken were those described in the Town's complaint.[1] Judge Trawick denied a *880 motion by the Town requesting a ruling that the Easement Area, or any portion of it, was subject to public trust rights.
The damages issue was scheduled for trial before a jury in August 2015. In pre-trial motions, both parties raised the issue of the public trust doctrine. After reviewing the issue further, Judge Trawick continued the trial and entered an order revising the 40A-47 Order (the "Revised 40A-47 Order").
The Revised 40A-47 Order concluded that the entire Easement Area was located within the State's "ocean beaches" as defined in N.C. Gen. Stat. § 77-20(e) (2015), and therefore was subject to public trust rights as described in N.C. Gen. Stat. § 1-45.1.[2] The Revised 40A-47 Order provided *330 both parties with the opportunity to seek new appraisals in light of Judge Trawick's ruling. Judge Trawick certified the Revised 40A-47 Order for immediate appeal pursuant to Rule 54(b) of the North Carolina Rules of Civil Procedure, but neither party noticed an appeal.
In advance of the trial on damages, the Town filed motions in limine seeking to exclude testimony by two appraisers hired by the Richardsons, Gregory Bourne ("Mr. Bourne") and Dennis Gruelle ("Mr. Gruelle"). The trial court prohibited all expert witnesses from testifying to opinions not disclosed prior to or at the time of their respective depositions. The trial court otherwise denied the motions.
At trial, Messrs. Bourne and Gruelle provided testimony and portions of their written appraisal reports were published to the jury. Mr. Bourne's report and testimony asserted that the taking had diminished the fair market value of the remainder of the Richardsons' property by $160,000. Mr. Gruelle's report and testimony asserted that the taking had diminished the value of the remainder of the Richardsons' property by $233,000.00.
Mr. Bourne testified that, in valuing only the land constituting the Richardsons' entire lot, he first determined the "[h]ighest and best use[, which] is that use which you can physically and possibly build that is legally permissible, that is financially feasible, and that reflects the maximum value, that will generate the maximum value of the property." After determining the best and highest use of the Richardsons' entire lot to be residential, he employed sales comparison and cost approaches to reach a "before [taking] land value [of] $855,000." After including the improvements to the property and other adjustments, Mr. Bourne arrived at a pre-taking value of the improved lot of $1,040,000.
To determine the impact of the Easement taking on the fair market value of the Richardsons' lot, Mr. Bourne reviewed comparable sales and found an eight percent difference in the value of oceanfront lots that extended all the way to the mean high water mark and beachfront lots that stopped short of the ocean. He made this comparison because, per Section 146-6(f), title to new land seaward of the former mean high water mark created by the nourishment project would vest *331 in the State.[3] The Town's use of the Easement, therefore, affixed the Richardsons' property line at the former mean high water mark and created a strip of State-owned land between the Richardsons' property line and the ocean. After considering *881 damage to the unencumbered portion of the lot, Mr. Bourne testified that the proper measure of damages was "[t]he difference between the before and the after [fair market values of the Richardsons' property] and I came up with $160,000." Applying his calculation to the entire lot's unimproved value of $855,000, Mr. Bourne "came up with an after the taking land value, that is the value of the land now encumbered by this easement for 10 years, of $70,000."
The Richardsons' other appraiser, Mr. Gruelle, testified that the highest and best use of the Richardsons' lot was residential and, after comparing sales of similar properties, concluded that "the value of the site was [$]880,000.... [$]880,000 is attributable to the value of the land."
Taking the $880,000 value of the entire lot with its highest and best use as residential property, Mr. Gruelle calculated a value of $28.95 per square foot. He then multiplied that number by the total square footage of the Easement Area, 7,280, and arrived at a total value of $210,756 for the Easement Area. Mr. Gruelle estimated that, based on the Easement Rights taken, the Town's use of the Easement Area for ten years exploited 90 percent of its land value; as a result, Mr. Gruelle testified that the value of the Easement taken was approximately $190,000.[4] Mr. Gruelle combined the Easement value with other negative impacts on the unencumbered property-including the effect on the view and ease of beach access resulting from the increased height of the dunes-to which he assigned a value of $43,000, and opined that "the total impact of the property is $233,000.... That is the just compensation to leave the property owner whole."
At the close of the Richardsons' evidence, the Town moved for directed verdict. Reasserting the grounds raised in its motions in limine , the Town argued that Messrs. Bourne's and Gruelle's valuations were unreliable and should be stricken; if that evidence were stricken, the Richardsons would have failed to prove damages, and the Town would be entitled to a directed verdict. The trial court denied the motion.
*332 Michael Moody, an expert witness for the Town, provided an opinion on two distinct fair market values: (1) the difference in fair market value of the Richardsons' entire lot before the taking and the remainder after the taking under the "before and after method;" and (2) the fair market value of the Easement. Mr. Moody determined the difference in total market value to be zero and determined the fair market value of the Easement to be $330. He arrived at the second number through the "market extraction" method, whereby he found two comparable vacant oceanfront lot sales, one encumbered by a permanent easement for beach nourishment and one unencumbered. Mr. Moody then calculated the difference in those sale prices, which came out to $1,000, and attributed that difference to the presence of the permanent easement. Because the Easement in this case was for a ten-year period rather than perpetual in duration, he reduced the extracted amount by two-thirds and arrived at a fair market value of $330 for the Town's taking.
The Town renewed its earlier motion for directed verdict at the close of its evidence, and the motion was denied. Following instruction by Judge Trawick and deliberations, the jury returned a verdict finding that the fair market value of the Easement was $60,000, and the difference in fair market value of the Richardsons' property pre-taking and the remainder post-taking was zero. The jury awarded the Richardsons $60,000 as the greater value.
The Town timely filed a motion for JNOV, arguing, among other things, that the Richardsons had failed to introduce evidence showing the fair market value of the Easement. Joined in the motion for JNOV was a motion for new trial and a motion for remittitur. Neither motion was ruled on by the trial court.
Eight months later, following a hearing and additional briefing, Judge Trawick entered JNOV in favor of the Town, declaring *882 that the Richardsons should recover nothing. Judge Trawick identified two bases for his ruling: (1) there was no compensable taking, as the Town already possessed an easement by implication to protect and preserve the State's ocean beaches by virtue of the State's public trust rights; and (2) in the event there was a compensable taking, there was no evidence from which the jury could find a fair market value of the Easement,[5] so the only available calculation of damages was the "before and after" value of the *333 unencumbered property. Because the jury found that value to be $0, that was the proper amount of damages.
The Richardsons appealed the JNOV; the Town cross-appealed the 40A-47 Order and Judge Trawick's denial of its motions in limine .
II. DISCUSSION
The Richardsons contend that the trial court erred in entering JNOV on grounds not asserted in the Town's motions for directed verdict and despite relevant evidence, provided by Mr. Gruelle, to support the jury verdict. We agree and reverse the entry of JNOV. However, we also agree with the Town that the trial court abused its discretion in admitting Mr. Gruelle's expert testimony over the Town's motions in limine and objections. As a result, we remand the case for a new trial.
A. Standard of Review
We review the entry of JNOV de novo , substituting our judgment for that of the trial court. Austin v. Bald II, L.L.C. , 189 N.C. App. 338, 342, 658 S.E.2d 1, 4 (2008). In exercising that judgment, we ask "whether the evidence was sufficient to go to the jury," Tomika Invs., Inc. v. Macedonia True Vine Pentecostal Holiness Church of God, Inc. , 136 N.C. App. 493, 499, 524 S.E.2d 591, 595 (2000), and "[t]he essential question is whether the [non-movant] met his burden at trial of presenting substantial evidence of his claim when all the evidence is taken in the light most favorable to the [non-movant] and all inconsistencies are resolved in favor of the [non-movant]." Asfar v. Charlotte Auto Auction, Inc. , 127 N.C. App. 502, 504, 490 S.E.2d 598, 600 (1997). "The hurdle is high for the moving party [on JNOV] as the motion should be denied if there is more than a scintilla of evidence to support the [non-movant's] prima facie case." Tomika Invs. , 136 N.C. App. at 499, 524 S.E.2d at 595 (citations omitted). However, JNOV is proper "when the evidence is insufficient as a matter of law to support the verdict." Beal v. K. H. Stephenson Supply Co., Inc. , 36 N.C. App. 505, 507, 244 S.E.2d 463, 465 (1978). Critically, we are concerned only with the evidence's relevancy and probative value, as opposed to its admissibility, on review of JNOV. See, e.g. , Bishop v. Roanoke Chowan Hosp., Inc. , 31 N.C. App. 383, 385, 229 S.E.2d 313, 314 (1976) ("All relevant evidence admitted by the trial court, whether competent or not, must be accorded its full probative force in determining the correctness of its ruling upon a motion for [JNOV.]" (citation and quotation marks omitted) (emphasis added) ).
*334 B. Public Trust Doctrine
The public trust doctrine, established by the common law of this State, involves two concepts: (1) public trust lands, which are "certain land[s] associated with bodies of water [and] held in trust by the State for the benefit of the public[;]" and (2) public trust rights, which are "those rights held in trust by the State for the use and benefit of the people of the State in common." Fabrikant v. Currituck Cty. , 174 N.C. App. 30, 41, 621 S.E.2d 19, 27 (2005) (citation and internal quotation marks omitted) (2005); see also Nies v. Town of Emerald Isle , 244 N.C. App. 81, 88, 780 S.E.2d 187, 194 (2015) ("This Court has recognized both public trust lands and public trust rights as codified by our General Assembly[.]" (emphasis added) ). Public trust lands include "the watercourses of the State and ... the State's ocean and estuarine beaches[,]" Fabrikant , 174 N.C. App. at 41, 621 S.E.2d at 27 (citation and internal quotation marks omitted), regardless *883 of whether they are publicly or privately owned. Nies , 244 N.C. App. at 93, 780 S.E.2d at 196-97. Public trust rights attach to the privately and publicly owned lands between the ocean waters and the most seaward of the following: the first line of stable natural vegetation, the toe of the frontal dune, or "any other reliable indicator of the mean regular extent of the storm tide." Id. at 93, 780 S.E.2d at 197.
Public trust rights "include, but are not limited to, the right to navigate, swim, hunt, fish, and enjoy all recreational activities" offered by public trust lands, as well as "the right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches." N.C. Gen. Stat. § 1-45.1 (2017) ; see also Nies , 244 N.C. App. at 88, 780 S.E.2d at 194. The State is tasked with protecting these rights pursuant to the North Carolina Constitution:
It shall be the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry, and to this end it shall be a proper function of the State of North Carolina and its political subdivisions to acquire and preserve park, recreational, and scenic areas, to control and limit the pollution of our air and water, to control excessive noise, and in every other appropriate way to preserve as a part of the common heritage of this State its forests, wetlands, estuaries, beaches, historical sites, openlands, and places of beauty.
N.C. Const. art. XIV, § 5.
Towns "may, by ordinance, define, prohibit, regulate, or abate acts, omissions, or conditions upon the State's ocean beaches and prevent or *335 abate any unreasonable restriction of the public's rights to use the State's ocean beaches." N.C. Gen. Stat. § 160A-205(a) (2017).[6] Thus, municipalities may "limit[ ] the public's right to use the public trust dry sand beaches ... through appropriate use of the State's police power[,]" Nies , 244 N.C. App. at 93, 780 S.E.2d at 197, enforce ordinances regulating the public trust through injunction and abatement actions, N.C. Gen. Stat. § 160A-175 (2017), and may assert the public trust doctrine as a defense to suits challenging such non-compensable regulatory exercises as Fifth Amendment takings requiring compensation. Nies , 244 N.C. App. at 94, 780 S.E.2d at 197 ; cf. Fish House, Inc. v. Clarke , 204 N.C. App. 130, 136-37, 693 S.E.2d 208, 213 (2010) (allowing a private defendant to assert the public trust doctrine as a defense to an action for trespass).
The legislature also has delegated the State's eminent domain powers to municipalities and counties for the purposes of:
[e]ngaging in or participating with other governmental entities in acquiring, constructing, reconstructing, extending, or otherwise building or improving beach erosion control or flood and hurricane protection works, including, but not limited to, the acquisition of any property that may be required as a source for beach renourishment.
N.C. Gen. Stat. § 40A-3(b1)(10) (2017).
C. Application to This Case
We now consider whether public trust rights render the taking here non-compensable and hold, on the procedural facts before us, that they do not.
The trial court concluded in the Revised 40A-47 Order that the Easement Area, though the private property of the Richardsons, was public trust land subject to public trust rights.[7] But the Town did not *336 argue at *884 trial that the public trust doctrine rendered the taking non-compensable. The trial court erred in entering JNOV eight months after the verdict on a basis not argued during the trial.
A motion for JNOV may be granted only "in accordance with [the movant's] motion for a directed verdict." N.C. Gen. Stat. § 1A-1, Rule 50(b)(1) (2017) ; see also Couch v. Private Diagnostic Clinic , 133 N.C. App. 93, 100, 515 S.E.2d 30, 36 (1999) ("A motion for JNOV is treated as a renewal of the motion for directed verdict. Thus, a movant cannot assert grounds on a motion for JNOV that were not previously raised in the directed verdict motion." (internal citations omitted) ). Because the trial court's entry of JNOV grants the Town's motion for JNOV "pursuant to Rule 50(b) [,]" it is proper only if it accords with the Town's earlier motion for directed verdict.
The Town's motion for directed verdict and motions in limine presented no argument that it already possessed the Easement Rights through the public trust doctrine. Nor did the Town argue that the public trust doctrine rendered the taking non-compensable. The motions sought only to limit expert testimony that would deny the effect of public trust rights on the compensable value of the Richardsons' property and, specifically, the Easement Area.
During the hearing on the motions in limine , when asked by the trial court why the public trust did not eliminate the need for condemnation, the Town expressly argued that the Easement Rights were not public trust rights and the condemnation was still necessary:
[THE TOWN]: ... The public trust rights [are] not about what we took, it's about the value of what we took.
...
THE COURT: Now let me ask you, then why did you have to do a taking?
[THE TOWN]: Because we wanted to put trucks and pipes and wanted to put sand on the property. That is what is in the complaint. ... Those are the rights we took. Public *337 trust rights doesn't go to the rights we took . It goes to the value of what we took. It limits the value because some of their rights and their bundle of rights weren't there in the first place. ... [A]ny time [the Richardsons] say it's got something to do with the rights we took, it has nothing to do with the rights we took. It has to do with the rights that were there to take.
...
[W]e don't want a ruling of this Court to preclude people from being able to walk on this beach. And we also don't want their perspective to keep us from showing that the value of this area was reduced by people having the ability to walk on the beach. It may or may not have been reduced by much and that is what we want. We want the ability to be able to say that people can walk on the beach in this easement area.
(emphasis added). The Town's motions for directed verdict at trial were likewise devoid of any argument that the Town already possessed Easement Rights or that the public trust doctrine precluded recovery, as they were simply renewals of the earlier motions in limine regarding expert testimony offered by the Richardsons, and the Town's motion for JNOV conceded that the taking was compensable and expressly requested entry of a judgment in the Richardsons' favor in the amount of $330.
During the JNOV hearing, Judge Trawick, unprompted by either party, advanced the question of whether the Town already possessed the Easement Rights through the public trust and requested additional briefing on the issue at the hearing on the motion for JNOV. Judge Trawick ultimately granted the JNOV motion based on the conclusion that *885 public trust rights precluded an award of compensation to the Richardsons.
But a trial court may only enter a sua sponte order on JNOV within ten days of entry of judgment; the JNOV here was entered months after final judgment. N.C. Gen. Stat. § 1A-1, Rule 50(b)(1) ; see also Jones v. S. Gen. Ins. Co. , 222 N.C. App. 435, 436-37, 731 S.E.2d 508, 509 (2012) (reversing a trial judge's sua sponte order for new trial entered more than ten days after judgment as "not properly entered" and "not permissible"). Further, such a sua sponte order may only "grant, deny, or redeny a motion for directed verdict made at the close of all the evidence ...." N.C. Gen. Stat. § 1A-1, Rule 50(b)(1). So, eight months after final judgment, the trial court could only enter JNOV under Rule 50(b)(1)
*338 consistent with those arguments raised by the Town in its timely filed motions for directed verdict and JNOV. As a result, we hold that the trial court erred in concluding on JNOV that the Town already possessed the Easement Rights and that the public trust doctrine rendered the taking non-compensable because neither argument was raised at directed verdict or JNOV.
Our holding finds further support in precedent interpreting procedural condemnation statutes and related caselaw. Section 40A-47 of our General Statutes provides that the trial court is required to determine "any and all issues raised by the pleadings other than the issue of compensation, including ... title to the land, interest taken, and area taken." N.C. Gen. Stat. § 40A-47 (2017) (emphasis added). This Court has read virtually identical language in highway condemnation statutes to mean that "at a minimum, a party must argue all issues of which it is aware, or reasonably should be aware, in [such] a hearing." City of Wilson v. The Batten Family, L.L.C. , 226 N.C. App. 434, 439, 740 S.E.2d 487, 491 (2013) (interpreting language almost identical to Section 40A-47 in Section 136-108). Also, in In re Simmons , 5 N.C. App. 81, 167 S.E.2d 857 (1969), this Court reviewed a host of treatises and decisions from other jurisdictions concerning the condemnor's admission of ownership in a condemnation action, and quoted with approval the following:
[T]he petitioner is estopped from showing that title is in the public or in itself, by dedication prescription or otherwise, if it has alleged in its petition that the respondent is the owner. ... The institution of the [condemnation] proceeding admits the ownership. The condemnor cannot claim the beneficial ownership of the land and at the same time assert that the condemnee claims all or some part of that interest[.] ... A party cannot proceed to condemn land as the property of another and then in that same proceeding set up a paramount right or title in itself either by prescription, dedication or otherwise.
5 N.C. App. at 86-87, 167 S.E.2d at 861 (internal citations and quotation marks omitted).
Here, the Town alleged in its complaint that the Richardsons, and not the Town, possessed the Easement Rights; the Richardsons' answer admits such possession. Assuming arguendo that the Town could still request a determination of the issue by the trial court when no issue as to the Town's pre-existing possession of the rights was "raised by the pleadings," N.C. Gen. Stat. § 40A-47, it was required to assert such an *339 argument in the hearing provided by that statute. City of Wilson , 226 N.C. App. at 439, 740 S.E.2d at 491.
In the initial hearing to determine all issues other than damages pursuant to Section 40A-47, counsel for the Town stated that "our theory of the taking here, [is] that the Town doesn't have the right to place the sand and do the work for this project without acquiring the easement rights we have condemned in this case." The hearing continued:
[THE TOWN]: We're talking about the rights-clearly they have the right to exclude the contract which-but for our acquisition of the easement rights .
...
THE COURT: ... You can't file a declaration for taking and then ask me to say that you took less than what the declaration says.
[THE TOWN]: I completely agree.
(emphasis added). As recounted supra , the Town maintained that position through the *886 hearing on its motions in limine even when alerted to the question by the trial court. Indeed, that was the Town's apparent position through its motions for directed verdict, final judgment, and its motion for JNOV. On appeal from a post-judgment order, the Town's argument comes too late.
Finally, although orders entered following an "all other issues" hearing are interlocutory, errors pertaining to "vital preliminary issues" determining what land is being condemned and "any question[s] as to its title" must be immediately appealed. N.C. State Highway Comm'n v. Nuckles , 271 N.C. 1, 14, 155 S.E.2d 772, 784 (1967) ; see also Dep't of Transp. v. Rowe , 351 N.C. 172, 176, 521 S.E.2d 707, 709 (1999) (limiting the immediate appeal rule in Nuckles to those two questions); but see Town of Apex v. Whitehurst , 213 N.C. App. 579, 583-85, 712 S.E.2d 898, 901-02 (2011) (holding that whether condemnation was for a public purpose, though not an issue of title or identification of land, was nonetheless a vital issue requiring immediate appeal, as it was necessary to determine whether a lawful taking had occurred at all).
The Town's argument that it already possessed the Easement Rights under the public trust doctrine raises an issue of vital importance concerning a question of title: whether the Richardsons' title included the rights the Town sought to take from them through condemnation. Because the Revised 40A-47 Order decreed that the Easement Rights *340 were taken by the Town through condemnation, the Town was required to assert any argument to the contrary by appeal within 30 days of the order's entry pursuant to N.C. R. App. P. 3(c)(1). See Nuckles , 271 N.C. at 14, 155 S.E.2d at 784 ; Rowe , 351 N.C. at 176, 521 S.E.2d at 709 ; City of Wilson , 226 N.C. App. at 440, 740 S.E.2d at 491 ; Whitehurst , 213 N.C. App. at 585, 712 S.E.2d at 902. This it failed to do, and we dismiss those arguments.[8]
D. Sufficiency of the Evidence
Having resolved whether the taking in this case was compensable, we consider whether the Richardsons presented evidence sufficient as a matter of law to support a jury verdict of $60,000 for the fair market value of the Easement. We hold that they did.
Section 40A-64(b) provides:
If there is a taking of less than the entire tract, the measure of compensation is the greater of either (i) the amount by which the fair market value of the entire tract immediately before the taking exceeds the fair market value of the remainder immediately after the taking; or (ii) the fair market value of the property taken.
N.C. Gen. Stat. § 40A-64(b) (2017). Valuation under the first subpart, Section 40A-64(b)(i), is commonly referred to as the "before and after method[,]" Town of Midland v. Wayne , 368 N.C. 55, 63, 773 S.E.2d 301, 307 n. 6 (2015), while the second method, per the plain language of the statute, is simply a fair market valuation of the discrete portion of property taken. N.C. Gen. Stat. § 40A-64(b)(ii). Thus, to measure the proper award to the Richardsons, the jury was required to: (1) calculate a value employing the "before and after method;" (2) calculate the fair market value of the Easement taken by the Town; and (3) award the Richardsons the greater of those two values.
Because the jury calculated the "before and after" measure of value to be zero and the Richardsons request reinstatement of the final *341 judgment on the jury verdict, our review concerns only the jury's calculation of the market value of the Easement itself. *887 While the statute does not define "fair market value," our Supreme Court has described it as follows:
[T]he well established rule is that in determining fair market value the essential inquiry is "what is the property worth in the market, viewed not merely with reference to the uses to which it is plainly adapted-that is to say, what is it worth from its availability for all valuable uses?"
State v. Johnson , 282 N.C. 1, 14, 191 S.E.2d 641, 651 (1972) (quoting Barnes v. N.C. State Highway Comm'n , 250 N.C. 378, 387, 109 S.E.2d 219, 227 (1959) (alteration in original) ). Stated in other terms, "the fair market value is 'the highest market price [property] would bring for its most advantageous uses [at the time of taking] and in the foreseeable future.' " In re Appeal of Parsons, 123 N.C. App. 32, 41, 472 S.E.2d 182, 188 (1996) (quoting United States v. Cunningham , 166 F.Supp. 76, 78 (E.D.N.C. 1958), rev'd on other grounds , 270 F.2d 545 (4th Cir. 1959), cert. denied , 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022, (1960) ). In calculating that value, "[a]ll factors pertinent to a determination of what a buyer, willing to buy but not under compulsion to do so, would pay and what a seller, willing to sell but not under compulsion to do so, would take for the property must be considered." City of Charlotte v. Charlotte Park & Recreation Comm'n , 278 N.C. 26, 34, 178 S.E.2d 601, 606 (1971).
Evidence of fair market value may be introduced through, among other means, the expert opinions of appraisers or the lay testimony of the landowner. Dep't of Transp. v. M.M. Fowler, Inc. , 361 N.C. 1, 6, 637 S.E.2d 885, 890 (2006). "Methods of appraisal acceptable in determining fair market value include: (1) comparable sales, (2) capitalization of income, and (3) cost. While the comparable sales method is the preferred approach, the next best method is capitalization of income when no comparable sales data are available." Id. at 13, 637 S.E.2d at 894 n. 5 (internal citations omitted). That said, "our courts have recognized that 'expert real estate appraisers should be given latitude in determining the value of property' in eminent domain cases[.]" City of Charlotte v. Combs , 216 N.C. App. 258, 263, 719 S.E.2d 59, 63 (2011) (quoting *342 Duke Power Co. v. Mom 'n' Pops Ham House, Inc. , 43 N.C. App. 308, 312, 258 S.E.2d 815, 819 (1979) ).
Here, the jury heard evidence concerning the "before and after method" valuation by the Richardsons' appraisers, who employed the sales comparison and cost approaches. The jury ultimately found this value to be zero. By contrast, it found the fair market value of the Easement taken to be $60,000 and awarded the Richardsons that amount as the greater of the found values. The Town contends that verdict is unsupported by legally sufficient evidence. We disagree.
Mr. Bourne, an expert witness for the Richardsons, estimated the Easement's value to be $70,000 by calculating the difference in value between properties that were oceanfront, in other words, those with property lines extending to the mean high water mark, and those that were merely beachfront, in other words, those with property lines abutting the beach but stopping short of the mean high water mark. This calculation, however, is derived solely from the beach nourishment project's impacts and is outside the statutory scope of a taking's compensable fair market value.
"The value of the property taken ... does not include an increase or decrease in value before the date of valuation that is caused by (i) the proposed improvement or project for which the property is taken[.]" N.C. Gen. Stat. § 40A-65 (2017). The fair market value of the Easement, as a discrete value under Section 40A-64(b)(ii), cannot be derived from factors resulting from the Town's beach nourishment project under Section 40A-65.[9] Mr. Bourne's $70,000 valuation, statutorily excluded from the fair market value of the Easement, is therefore neither relevant to nor probative of the issue, so this evidence does not support the jury's award on this question. See, e.g. , Asfar , 127 N.C. App. at 504, 490 S.E.2d at 600 (recognizing that only substantial, i.e. relevant, evidence is considered on JNOV).
Our holding in this context accords with statutory and caselaw governing condemnations *888 by the North Carolina Department of Transportation. Compensation for a partial taking for highway condemnations is measured through application of the "before and after method." N.C. Gen. Stat. § 136-112(1) (2017). If an entire tract is condemned, the condemnee is entitled to "the fair market value of the property at the time of taking." N.C. Gen. Stat. § 136-112(2). Because the damages statute applicable to this case, Section 40A-64(b), requires the calculation *343 of both measures of damages contained in Section 136-112, i.e. , the fair market value of the discrete taking and the "before and after method" value, reference to our caselaw on damages in highway condemnations is instructive. See Town of Midland , 368 N.C. at 63, 773 S.E.2d at 307 (construing Section 40A-64(b) through reference to Section 136-112 and related caselaw).
In applying Section 136-112, this Court has held that "[t]he market value of the condemned property is to be determined on the basis of the conditions existing at the time of the taking ." Dep't of Transp. v. Mahaffey , 137 N.C. App. 511, 518, 528 S.E.2d 381, 385 (2000) (emphasis added) (citation omitted). And, while it is true that the post-condemnation impacts of a partial taking may be considered in arriving at a fair market value under that statute, this applies only "to the fair market value of the remainder immediately after the taking ...." N.C. State Highway Comm'n v. Gasperson , 268 N.C. 453, 455, 150 S.E.2d 860, 862 (1966) (emphasis added) (citation omitted). Assuming arguendo that Mr. Bourne's $70,000 valuation, derived from post-taking impacts, was relevant to the issues of damages in this case, it could only be relevant to the difference in fair market value calculation pursuant to Section 40A-64(b)(i) and not the discrete fair market value of the Easement at the time of taking under Section 40A-64(b)(ii).
We next consider Mr. Gruelle's testimony and hold that, without regard to its admissibility, it is sufficient as a matter of law to support the jury's verdict.
"[T]he measure of damages for a temporary taking is the 'rental value of the land actually occupied' by the condemnor." Combs , 216 N.C. App. at 261, 719 S.E.2d at 62 (quoting Leigh v. Garysburg Mfg. Co. , 132 N.C. 167, 170, 43 S.E. 632, 633 (1903) ); see also United States v. Banisadr Bldg. Joint Venture , 65 F.3d 374, 378 (4th Cir. 1995) ("[W]hen the Government takes property only for a period of years, ... it essentially takes a leasehold in the property. Thus, the value of the taking is what rental the marketplace would have yielded for the property taken."). The United States Supreme Court's discussion concerning the determination of the value of a temporary taking is instructive:
The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent. Its measure is the amount of that equivalent. ... But when the property is of a kind seldom exchanged, it *344 has no 'market price,' and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights. These considerations have special relevance where 'property' is 'taken' not in fee but for an indeterminate period.
...
[D]etermination of the value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner and a hypothetical lessee of that temporary interest would have taken place in the usual framework of such negotiations. ... [T]he proper measure of compensation is the rental that probably could have been obtained ....
Kimball Laundry Co. v. United States , 338 U.S. 1, 5-7, 69 S.Ct. 1434, 1438-39, 93 L.Ed. 1765, 1772-73 (1949). Because temporary easements are valued as rentals rather than sales under North Carolina law, Combs , 216 N.C. App. at 261, 719 S.E.2d at 62, the fair market value of the Easement taken by the Town is the "fair market rental value for the period of time the property is taken[.]" 4 Nichols on Eminent Domain § 12E.01[4] (rev.3d ed. 2006) (citing Leigh , 132 N.C. at 170, 43 S.E. at 633 ).
*889 As recounted supra , Mr. Gruelle testified that the Easement was valued at $190,000. He reached this value by determining the best and highest use of the entire lot, calculating a value per square foot based on that use, and applying that value to the square footage of the Easement Area. He then reduced that total value by ten percent, reasoning that the Town's use of the Easement Area "represented 90 percent of the value of the easement area." Mr. Gruelle explained that this valuation "look[s] at [the Easement] as the land rental because that's what it is[,]" and testified that his number was "consistent with the way the market looks at ground lease or renting, use of the land for a period of time." In seeking to arrive at the fair rental value of the Easement, Mr. Gruelle provided a scintilla of evidence relevant to that issue. "A scintilla of evidence is defined as very slight evidence," Everhart v. O'Charley's Inc., 200 N.C. App. 142, 149, 683 S.E.2d 728, 735 (2009) (citation and quotation marks omitted), and Mr. Gruelle's $190,000 valuation provided, at a minimum, very slight evidence sufficient to support the jury's finding that the Easement's fair market value was $60,000.
The Town argues in support of its cross-appeal that Mr. Gruelle's testimony is incompetent. It further contends that such an argument is *345 properly asserted under our Rules of Appellate Procedure as "an alternative basis in law for supporting the [JNOV.]" N.C. R. App. P. 28(c). This is not so; in appellate review of JNOV, "[a]ll relevant evidence admitted by the trial court, whether competent or not, must be accorded its full probative force in determining the correctness of its ruling ...." Bishop v. Roanoke Chowan Hosp., Inc. , 31 N.C. App. 383, 385, 229 S.E.2d 313, 314 (1976) (citation and quotation marks omitted); cf. Huff v. Thornton , 23 N.C. App. 388, 391, 209 S.E.2d 401, 403 (1974) ("We hold ... that an assignment of error directed to the trial court's ruling on a motion for directed verdict ... does not present for review rulings on the admission or exclusion of evidence ." (emphasis added) ). This limitation on our review is designed to avoid unfairness, as "the admission of such evidence may have caused the [Richardsons] to omit competent evidence of the same import." Huff , 23 N.C. App. at 390, 209 S.E.2d at 403. We therefore do not reach the issue as raised in the Town's appellee brief under Rule 28(c). Mr. Gruelle's testimony was admitted-albeit in error, as we hold infra Part II.E.-and because it provides a scintilla of evidence to support the jury's verdict, we reverse the trial court's entry of JNOV.
E. The Town's Cross-Appeal
Beyond its appellee brief, the Town also cross-appeals the denial of its motions in limine on the grounds that Mr. Gruelle's testimony is incompetent. The Richardsons contend that the Town is without standing to appeal, as it is not a "party aggrieved" within the meaning of N.C. Gen. Stat. § 1-271 (2017). Seeing merit in the Town's cross-appeal and assuming arguendo that the Town does not otherwise have the right to appeal the interlocutory orders, we elect to treat the Town's cross-appeal as a petition for writ of certiorari and grant it in our discretion. N.C. R. App. P. 21(a)(1) (2017) ("The writ of certiorari may be issued ... when no right of appeal from an interlocutory order exists ....").[10]
The Town argues that Mr. Gruelle's testimony was inadmissible because it failed to meet the criteria of *346 Rule 702(a) of the North Carolina Rules of Evidence.[11] A trial *890 court's ruling on the admissibility of expert opinion is subject to review only for an abuse of discretion. State v. McGrady , 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016). McGrady adopted the standard of admissibility applicable to expert testimony pursuant to Rule 702(a) as set forth in Daubert v. Merrell Dow Pharm., Inc ., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and clarified in General Elec. v. Joiner , 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) and Kumho Tire Co. v. Carmichael , 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The North Carolina Supreme Court in McGrady noted that this admissibility standard "is not new to North Carolina law[,]" 368 N.C. at 892, 787 S.E.2d at 10, and that it did not overrule existing caselaw "as long as those precedents do not conflict with the rule's ... text or with Daubert , Joiner , or Kumho ." 368 N.C. at 888, 787 S.E.2d at 8. The principal change in the standard post- McGrady regarding reliability is a heightened "level of rigor that our courts must use to scrutinize expert testimony before admitting it." Id . at 892, 787 S.E.2d at 10 (citations omitted).
The Town directs us to this Court's pre- McGrady decision in City of Charlotte v. Combs , 216 N.C. App. 258, 719 S.E.2d 59 (2011), which reversed a judgment on a jury verdict in a temporary construction easement condemnation action and ordered a new trial on the basis that the condemnor's expert appraiser's methodology was not sufficiently reliable to be admissible. 216 N.C. App. at 266-67, 719 S.E.2d at 65-66. That decision, in turn, relied on the North Carolina Supreme Court's decision in Haywood , which affirmed a directed verdict in favor of the condemnor after holding that the condemnee's experts' opinions were unreliable. 360 N.C. at 352-53, 626 S.E.2d at 647. In Haywood , experts testified that certain percentages used in arriving at damages were based on "feelings and personal opinions," which the Supreme Court *347 concluded were "unsupported by objective criteria," and amounted to "hunches and speculation." Id. at 352, 626 S.E.2d at 647. As a result, our Supreme Court held that the experts' opinions were not based on "any method used to arrive at [their] figures," and therefore were not reliable. Id. at 352, 626 S.E.2d at 647. Combs reversed a judgment based on a jury verdict because the condemnor's expert "based his valuation of the [easement] on his experience that such temporary takings do not affect the remainder of the condemnee's property, rather than an actual assessment that the [condemnee's] property outside of the [easement] was not affected[.]" 216 N.C. App. at 266-67, 719 S.E.2d at 65. We therefore held that the appraiser's "method of proof lacked sufficient reliability." Id. at 266-67, 719 S.E.2d at 65. As recounted supra , Mr. Gruelle arrived at his $190,000 value for the Easement by calculating a dollar-per-square-foot value for the property, applying that value to the square footage of the Easement Area, and reducing that total amount by ten percent. Mr. Gruelle then opined that the Easement "represented 90 percent of the value of [the Easement Area]." When asked how he arrived at the 90 percent number, he stated that it was "based on the broad nature of those rights, [which] in [his] opinion ... represented 90 percent of the value of the easement area."[12] He then "check[ed] ... if that 90 percent was reasonable" by evaluating the taking as a temporary construction easement or a ground lease.
Rather than attempting to compare the Easement to actual temporary construction *891 easements and ground leases, and even after recognizing that "there are many indicators based on the value of the property" in calculating the value of such property rights, Mr. Gruelle assumed that the "typical" temporary construction easement and ground lease is valued at "a ten percent return to the land for the duration[.]" That formulation, applied to the ten-year duration of the Easement, resulted in a complete taking of 100 percent of the Easement Area's value. After conceding that his calculation was equivalent to a total taking in fee of the Easement Area, Mr. Gruelle decided to depart from that result as he did not "think it would exceed the value of the fee[,]" and instead asserted that 90 percent was the correct value because "it would come close to *348 the fee value ... because it was total ... utilization of that property for 10 years."[13]
Mr. Bourne, who was retained by the Richardsons in part to review and support Mr. Gruelle's appraisal, testified at deposition that Mr. Gruelle's assumption that the typical ground lease or temporary construction easement was valued at a ten-percent-per-year return was unfounded. Specifically, Mr. Bourne stated that: (1) ground leases and temporary construction easements are different; (2) "[t]hey all have different terms, so it's difficult to generalize[;]" (3) he would not assume a return of ten percent per year, but instead "would look at some doc-yes, some information[;]" and (4) there was no "rule of thumb" that ground leases are valued at a ten-percent-per-year return.
As in Haywood , Mr. Gruelle did not articulate a method for reaching his opinion that the easement was valued at $190,000. Haywood , 360 N.C. at 352, 626 S.E.2d at 647 ; see also Combs , 216 N.C. App. at 266-67, 719 S.E.2d at 65. Testimony based solely on a conclusory opinion does not present any method to which a trial judge can apply the three-part reliability test from Daubert under Rule 702, and admitting such evidence is an abuse of discretion. Combs , 216 N.C. App. at 266-67, 719 S.E.2d at 65-66.[14]
To the extent that Mr. Gruelle attempted to verify his 90 percent opinion by treating the Easement as a "typical" ground lease or temporary construction easement, his testimony "seemed to deny the sufficiency of his own ... methodology[,]" Kumho , 526 U.S. at 155, 119 S.Ct. at 1178, 143 L.Ed.2d at 255, as he recognized that such a calculation would value the Easement at 100 percent of its fee value, not his preferred value of 90 percent. Rather than accept this illogic, he "made [an] adjustment" back down to his 90 percent number, but did not explain why an adjustment *349 by ten percent, and not some other percentage, was appropriate. Finally, Mr. Bourne demonstrated that Mr. Gruelle's method was unreliable, testifying at deposition that there is no "typical" ten percent return per year for ground leases or construction easements, that every such valuation was different, and that engaging in such a valuation would require a review of external data. Mr. Gruelle's unfounded assumption that the "typical" ground lease or temporary construction easement carried a ten percent return per year was simply "based on hunches and speculation ... lack[ing] sufficient reliability." Haywood , 360 N.C. at 352, 626 S.E.2d at 647. Such "conjecture, speculation, or surmise is not allowed by the law to be a basis of proof in respect of damages or compensation" in condemnation cases, *892 Raleigh, C. & S. Ry. Co. v. Mecklenburg Mfg. Co. , 169 N.C. 156, 160, 85 S.E. 390, 392 (1915).[15] Therefore, Mr. Gruelle's testimony fails the requirement of Rule 702 that "[t]he testimony [must be] the product of reliable principles and methods." N.C. R. Evid. 702(a)(2) (2015). The trial court abused its discretion in admitting this testimony, and remand for a new trial is appropriate. Combs , 216 N.C. App. at 267, 719 S.E.2d at 66 (remanding for new trial in light of improperly admitted expert testimony as to just compensation); see also M. M. Fowler , 361 N.C. at 15, 637 S.E.2d at 895 (remanding for new trial on damages in condemnation action where expert testimony was erroneously admitted).
III. CONCLUSION
The Town is not entitled to JNOV on the ground that it already possessed the Easement Rights through the public trust doctrine, nor on the ground that the doctrine otherwise precludes all recovery, because these arguments were not raised until months after final judgment. Further, the Town is estopped from asserting that no condemnation occurred and that it already possessed these rights because: (1) it admitted it did not possess them in its complaint; (2) it did not raise the issue at the "all other issues" hearing under Section 40A-47 ; (3) it expressly disavowed reliance on the public trust doctrine at that hearing and at its hearing on its motions in limine ; and (4) it did not raise the issue at trial, in its motions for directed verdict, or in its motion for JNOV. Further, the Richardsons introduced evidence sufficient to support the jury verdict. We therefore reverse the entry of JNOV. We nonetheless remand for a new trial on the Town's cross-appeal, as we hold that the trial court abused its discretion in admitting Mr. Gruelle's expert testimony. At the new trial the parties may introduce additional new evidence on the issue of damages in conformity with this opinion.
REVERSED AND REMANDED FOR NEW TRIAL.
Judge HUNTER concurs.
Judge DILLON concurs in part and dissents in part in a separate opinion.

The Richardsons present several arguments concerning various other rights that they contend were taken by the Town, including littoral rights, secondary easement access rights vesting in the Town, and a complete loss of title to the Easement Area. None of these rights falls within the ambit of the taking declared in the 40A-47 Order, nor do we need to address their compensability. Resolution of the Richardsons' appeal concerns only whether: (1) public trust rights preclude recovery of damages; and (2) the Richardsons presented evidence sufficient to support the jury's verdict.

This Court would later reach the same holding as that decreed by Judge Trawick in his Revised 40A-47 Order. See Nies v. Town of Emerald Isle , 244 N.C. App. 81, 92-93, 780 S.E.2d 187, 196-97 (2015) (holding that N.C. Gen. Stat. § 77-20 and the common law vest in the State public trust rights in "ocean beaches" as measured on the landward side by the more seaward of the toe of the frontal dune or the first vegetation line; where neither exists, it is measured by the storm trash line "or any other reliable indicator of the mean regular extent of the storm tide").

Section 146-6(f) provides, in relevant part: "title to land in or immediately along the Atlantic Ocean raised above the mean high water mark by publicly financed projects which involve hydraulic dredging or other deposition of spoil materials or sand vests in the State." N.C. Gen. Stat. § 146-6(f) (2017).

By mathematical formula, Mr. Gruelle calculated the value of the Easement as follows: ( ($28.95/ft[2]) * 7,280ft[2]) * 0.9 = $189,680.4.

This conclusion contradicts the trial court's earlier conclusion in the same order that "competent expert testimony introduced at trial on the ... market value of the [Easement shows a] $330.00 market value ...."

This same authority has also been delegated to the State's counties. N.C. Gen. Stat. § 153A-145.3 (2017).

The Richardsons conceded in their briefs that public trust rights attached to the Easement Area. Despite this concession, the Richardsons argue that the Revised 40A-47 Order was "erroneous[,]" and that the original 40A-47 Order, decreeing the Easement Area free of public trust rights, is the law of the case. Rule 54(b) of the North Carolina Rules of Civil Procedure states that "in the absence of entry of ... a final judgment, any order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." N.C. Gen. Stat. § 1A-1, Rule 54(b) (2017). Because orders entered under Section 40A-47 are interlocutory rather than final judgments, City of Winston-Salem v. Slate , 185 N.C. App. 33, 37, 647 S.E.2d 643, 646 (2007), Judge Trawick, who entered the earlier 40A-47 Order, was permitted to enter the Revised 40A-47 Order. The Revised 40A-47 Order was also certified for immediate appeal pursuant to Rule 54(b), and neither party timely noticed an appeal therefrom; as a result, they may not contest its contents months after its entry. See, e.g., Guthrie v. Conroy , 152 N.C. App. 15, 19, 567 S.E.2d 403, 407 (2002) (noting that appeal of an order certified pursuant to Rule 54(b) must be immediately appealed within the time proscribed by N.C. R. App. P. 3(c)(1) ). We leave the Revised 40A-47 Order undisturbed in resolving this appeal.

Though we hold that the Town is estopped from advancing the argument that it already possessed the Easement Rights pursuant to the public trust doctrine in this action, nothing in this opinion should be read to preclude condemnors in other actions from asserting such an argument prior to a 40A-47 hearing, timely and appropriately amending their complaints and pleadings if able, or otherwise raising the issue when proper before the trial court. Nor should this opinion be read to preclude a trial court from amending its 40A-47 order pursuant to Rule 54(b) of our Rules of Civil Procedure prior to final judgment, or under any other available authority, when doing so would not run afoul of the prohibition against superior court judges modifying, overruling, or changing another superior court judge's ruling. See, e.g., Bruggeman v. Meditrust Co., LLC , 165 N.C. App. 790, 795, 600 S.E.2d 507, 510-11 (2004) (detailing the rule prohibiting superior court judges from altering one another's orders and exceptions thereto).

The Town asserted this argument in its directed verdict motion.

The Richardsons' brief on cross-appeal contains a purported "motion for sanctions." However, "[m]otions to an appellate court may not be made in a brief" and must instead be made in accordance with the applicable Rules of Appellate Procedure. Horton v. New South Ins. Co. , 122 N.C. App. 265, 268, 468 S.E.2d 856, 858 (1996) ; see also Johnson v. Schultz , 195 N.C. App. 161, 164, 671 S.E.2d 559, 562 (2009) (declining to address a motion presented in a brief for noncompliance with N.C. R. App. P. 25 and 37 ). We decline to consider the Richardsons' "motion," particularly in light of the Town's meritorious argument.

The Richardsons rightly point out that, when a motion in limine seeking to exclude certain evidence has been denied, the movant must object to the admission of that evidence at trial to preserve the matter for appeal. State v. Patterson , 194 N.C. App. 608, 616, 671 S.E.2d 357, 362 (2009), overruled on separate grounds , State v. Campbell , 368 N.C. 83, 772 S.E.2d 440 (2015). The Town did so here. The trial transcript discloses six instances in which Mr. Gruelle testified on direct to the $190,000 value of the Easement; each one was followed by an objection from the Town's attorneys. While it is true that Mr. Gruelle discussed the number as part of lengthy answers that were uninterrupted by either party's counsel, the trial court acknowledged that the nature of the Richardsons' questioning and Mr. Gruelle's answers made it difficult for the Town to know when to object, and the Town did lodge objections at the conclusion of each answer from Mr. Gruelle. Finally, the Town's counsel stated on the record his intention to object to the opinions given by Mr. Gruelle. On the transcript before us, we hold that the Town preserved the issue for appellate review.

Mr. Gruelle's written report provides no indication of how he arrived at the 90 percent number; rather it simply states that "the property owners will lose control of approximately 24% of their whole property and 100% of their beach property. As such, the percentage of the rights acquired are concluded to represent 90% of the fee value of the easement area."

Mr. Gruelle's deposition testimony largely comports with his testimony at trial, with the added details at deposition that: (1) he did not discuss the valuation of beach nourishment easements with appraisers and real estate agents local to the Nags Head area in preparing his written report; and (2) he could not further "br[eak] [the 90 percent number] out" to explain it, and instead explained that he just "looked at it as a ten percent return on the land, ... like a temporary construction easement."

We note that the trial court's JNOV order implicitly acknowledges that Mr. Gruelle's testimony was inadmissible as to the fair market value of the Easement, as it concluded "[t]he only competent expert testimony introduced at trial on the first preliminary question regarding market value of the temporary beach nourishment easement was the $330.00 market value testified to by the Town's expert witness Michael N. Moody, MAI." See Blair Invs., LLC v. Roanoke Rapids City Council , 231 N.C. App. 318, 321, 752 S.E.2d 524, 527 (2013) ("[C]ompetent evidence is generally defined as synonymous with admissible evidence[.]") (citation omitted).

This opinion was reprinted in 1955 at Carver v. Carolina, C. & O. Ry. Co ., 169 N.C. 204, 85 S.E. 293 (1915).